577 So.2d 977 (1991)
FLORIDA POWER CORPORATION, Appellant/Cross-Appellee,
v.
Frank STENHOLM, Appellee/Cross-Appellant.
No. 90-2465.
District Court of Appeal of Florida, First District.
March 28, 1991.
Rehearing Denied May 2, 1991.
Rex A. Hurley and William H. Rogner of Zimmerman, Shuffield, Kiser & Sutcliffe, P.A., Orlando, for appellant/cross-appellee.
Andrew G. Pattillo, Jr. and Jonathan D. Ohlman of Pattillo & McKeever, P.A., Ocala, for appellee/cross-appellant.
WIGGINTON, Judge.
Florida Power Corporation, the employer/self-insured, appeals from the final order of the judge of compensation claims finding compensable claimant's present condition known as cryptococcal meningitis. Claimant cross-appeals the judge's failure to award interest on past due medical bills. *978 We affirm the issues raised on appeal but reverse on cross-appeal.
Claimant is 37 years old and began working for Florida Power in September 1976, with his primary work location being at the Crystal River plant in Ocala. Claimant was employed as a "casual" employee, meaning that he worked only during periods when at least a portion of the plant was closed for repairs. Consequently, claimant would work erratically during any given year, spending several weeks or months unemployed.
The evidence showed that the Crystal River site has five separate generators. Units 1, 2, 4, and 5 are fossil fuel plants. Their design is open, allowing access to pigeons that occasionally roost in the extreme upper regions of these massive 13 to 15 story buildings. Unit 3, however, is the nuclear plant with an entirely enclosed design.
According to claimant, his work assignments in 1988 included working in Plant 5 from March 28 to April 22; Plant 2 from April 22 through May 18; and Plant 1 from October 29 through November 17. Florida Power points out that the vast majority of claimant's employment was in Unit 3, or the nuclear plant, where he was not exposed to pigeons or their droppings. Nonetheless, it concedes that during the ten months preceding the onset of claimant's symptoms in October 1988, he had worked at least six weeks in areas containing pigeon feces.
On October 5, 1988, claimant began experiencing the early symptoms of cryptococcal meningitis. They began as flu-like symptoms but over the next few months grew in severity to the point where claimant was experiencing excruciating headaches and seizures. On March 5, 1989, he entered Shands Hospital and, after several diagnostic tests, was determined to be suffering from cryptococcal meningitis, an infection involving the covering of the brain and spinal cord, or the meninges, caused by a yeast, or fungus. This particular yeast has been found in soil, grain, fertilizer, flowers, corn, milk, peach juice, dust, and in pigeon feces. The disease is generally contracted by those having some predisposition toward the disease and it was suggested that an exposure to a single molecule, or one breath full, can trigger the onset of the disease in those particular people.
Dr. Utz, board certified in Internal Medicine and recognized as one of the foremost authorities on cryptococcal meningitis, testified on behalf of claimant and stated that cryptococcal neoformans are found most abundantly in nature in pigeon droppings, and that in no other identified site has the organism been cultured in consistent and frequent numbers, facts widely accepted in the medical literature. To that observation, Dr. Diamond, testifying on behalf of Florida Power, agreed.
It was shown through the medical testimony that infection of humans occurs primarily through inhalation of particles containing the live organism and the primary vector appears to be air currents. Cryptococcosis has a central focus in the lungs, and disseminates through the blood stream localizing in other sites of the body such as the meninges, thus causing this particular strain of meningitis.
Dr. Greer, claimant's treating physician and head of the Department of Neurology at the University of Florida College of Medicine, acknowledged that cryptococcal meningitis can be caused by a single molecule, or one specific exposure to the fungus, coinciding with the expressed view of Dr. Utz. Dr. Utz in turn confirmed the proposition that one who works in an environment in which he breathes the cryptococcal organism is at greater risk for cryptococcosis and cryptococcal meningitis than one who works in an environment in which he does not inhale such organisms.
The presence of pigeon droppings at the Crystal River plant was observed by the judge herein while inspecting the site at the request of the parties. It was also described in the testimony of coworkers concerning the work conditions in 1988, and confirmed by claimant's testimony. Claimant described his direct contact with the droppings and his presence at and beneath places where such droppings were disturbed *979 by actions of his fellow employees. No evidence was presented that with the exception of his employment, claimant had any indicated exposure to pigeon droppings or to the risk of inhaling the cryptococcal organisms derived therefrom.
On the question of whether the source and cause of claimant's cryptococcal meningitis was an organism inhaled by him while in the course of his employment, the degree of probability was addressed by the opinions of Doctors Greer and Utz. They characterized the causal connections as "reasonable," "logical," "reasonably probable," and based in part on the magnitude of claimant's exposure in the work place as compared to the potential elsewhere. According to Dr. Utz, the exposure and subsequent incubation of the disease occurs over a period of weeks or months. Thus it was his conviction that the causal connection between claimant's work-connected exposure and the disease was unimpaired by the hiatus of weeks or months between claimant's last direct and substantial exposure to pigeon droppings and the appearance of symptoms.
In answer to the suggestion that an absence of cases of cryptococcal meningitis in other similarly exposed workmen in the same environment cast doubt upon the claimant's claim, both Dr. Utz and Dr. Greer stated that likely there had been many mild cases of pulmonary cryptococcosis among his coworkers. The advancement of cryptococcosis beyond the subclinical stage to a more serious variety is often marked by the patient who has some impaired or otherwise defective immune or defense mechanism. In only about half of such patients can it be determined what the defect is; in others, like claimant, such impairment is presumed.
In his order, the judge of compensation claims postulated that the two possible theories for recovery would be either occupational illness or exposure. Concluding that, based on the evidence, cryptococcal meningitis does not meet the qualifications of an occupational disease, the judge found that claimant could nonetheless recover on an exposure theory. It is with this conclusion that Florida Power takes exception. Although agreeing with the judge that cryptococcal meningitis is not a disease compensable as an occupational disease under section 440.151, Florida Power maintains the judge nonetheless erred by applying the exposure theory of accident here where the facts demonstrate that such theory is inapplicable.
In so arguing, Florida Power suggests that the exposure doctrine necessarily contemplates the effect on the body of repetitive trivial traumas which are not significant enough to produce a discernible or visible result until the passage of time, citing to Alpert, Florida Workers' Compensation Law (4th Ed.), section 6-6. Florida Power goes on to urge that the fundamental premise of the exposure doctrine is that repeated or prolonged exposure to a force or a substance causes the injury. Worden v. Pratt and Whitney Aircraft, 256 So.2d 209 (Fla. 1971). Thus, its position is that the exposure doctrine does not apply unless prolonged exposure is shown before the onset of the disability. In turn, Florida Power stresses the medical testimony and articles submitted into evidence below showing that cryptococcal meningitis is not caused by prolonged exposure but may be caused by inhalation of a single molecule of the fungus encountered anywhere in the environment.
Although many of the relevant "exposure cases" do indeed involve recovery on the basis of prolonged exposure, we must nonetheless disagree with Florida Power's restrictive premise that prolonged exposure is essential to recovery. In advancing its view, as noted above, Florida Power seizes on an observation by Mr. Alpert in his scholarly work on Florida's Workers' Compensation Law regarding the relationship between repetitive trivial traumas and the exposure doctrine. In fact, the observations made by Mr. Alpert on Florida's exposure cases when read in their entirety would certainly not exclude claimant's exposure in the instant case. Significantly, Mr. Alpert states:
The Florida Act provides benefits for injury by accident and occupational disease. *980 It does not provide benefits for exposure to deleterious substances or conditions. However, the courts have engrafted a so-called exposure doctrine upon the Act. What is actually being discussed is the effect upon the body of repetitive trivial trauma which trauma is not significant enough to produce a discernible or visible result until the passage of time or cumulative injury. In the desire to label what does not need labeling the nomenclature of exposure has developed. Perhaps it would be more appropriate for the courts to discard the label. The compensable so-called exposure cases should involve an unexpected or unusual event or result, happening suddenly, whereas the non-compensable cases should not. The unusual event or result may not be measurable at the time of injury (by our present scientific instruments) but at some point in time, measurement becomes possible and at that point we discover that at that point or some earlier point there was an accident. In essence, therefore, the so-called exposure cases are merely a reaffirmation of our inability to measure or discover all accidents; not a distinct accident entity.

Florida Workers' Compensation Law (4th Ed.), section 6-6, p. 132 (emphasis added). As Mr. Alpert went on to point out, this concept was recognized early on by the supreme court in its leading "exposure" cases, for instance, in Meehan v. Crowder, 158 Fla. 361, 28 So.2d 435 (Fla. 1946). Therein, the claimant was exposed over a period of three days to bichloride of mercury. Over the course of subsequent months, he developed an ailment later diagnosed as nephritis or "Bright's disease," caused by the absorption of this substance. In affirming the decision of the Industrial Relations Commission to reverse the deputy commissioner's denial of benefits, the supreme court simply analyzed the question of compensability in terms of whether the injury was caused by an accident as contemplated by the then Workmen's Compensation Act. In holding that it was caused by an accident, the supreme court recognized the rule that the element of time, place and cause must be clearly proven. The court also observed that the evidence was abundantly clear that the cause of the claimant's ailment was mercury poisoning, and without question the poison was absorbed during claimant's employment over a course of three days. In the supreme court's opinion, those facts satisfied the rule. Although it was pointed out that the claimant was unable to identify some event which preceded the injury, the court responded that the "event here is the sudden entry of the poisonous fumes into [the claimant's] body. The injury followed." Id. 28 So.2d at 437. We perceive little difference between the circumstances in the instant case and those involved in Meehan v. Crowder.
A similar analysis was earlier employed by the supreme court in Orr v. Florida Industrial Commission, 129 Fla. 369, 176 So. 172 (Fla. 1937). Therein, the claimant suffered a fatal sun stroke while using a blow torch to lay sewer pipe on a hot sunny day. In concluding that the death was indeed an accident under the terms of the Florida Workmen's Compensation Act, the supreme court subscribed to the principle to which other jurisdictional authorities had given assent to the effect that
... `the harmful condition does arise out of the employment, if, in the performance of the duties for which he was engaged, in the manner required or contemplated by the employer, it is necessary for the employee to expose himself to a danger, materially in excess of that to which people commonly in that locality are exposed, when not situated as he is when thus performing his service, and that such excessive exposure may be found to have been the direct cause of the injury, though operating upon other conditions of common exposure.'
Id. 176 So. at 173.
Thus, as can be seen from the foregoing authorities, it is not the prolonged nature of the exposure that is determinative in these early exposure cases but rather the issue of whether the exposure arose out of and in the course of employment, and was of such an extent as to take it out *981 of the realm of hazards to which people in general are exposed. Worden v. Pratt and Whitney, 256 So.2d 209 (Fla. 1971), relied on by Florida Power, does not dictate otherwise but is merely representative of the more common exposure cases involving repeated exposure over a period of months or years in which the condition was held not compensable because of the view widely held that it was not caused by an accident happening suddenly and arising out of and in the course of employment. In reversing the denial of the claim in Worden, the supreme court simply ruled that "[t]he accidental nature of an injury is not altered by the fact that, instead of a single occurrence, the injury is the cumulated effect of a series of occurrences." Id. at 210. In fact, the court observed that in the earlier exposure cases, what was "stressed" was not the need for the exposure to be sudden and immediate but, that for the employee to be entitled to compensation, "he must have been subjected to more than the ordinary hazards confronting people generally." Id. Of course, that observation clearly suggests the converse, that a single exposure certainly would present no obstacle to compensability given adequate evidentiary proof of causation and facts satisfying the requirement that the hazard be greater than normal.
In that regard, the instant case, which theoretically involves a "single dose" exposure, must be distinguished from cases decided by this court involving repeated exposure or repetitive trauma suffered by the claimant. Such cases are exemplified by the circumstances in Festa v. Teleflex, Inc., 382 So.2d 122 (Fla. 1st DCA) pet. for rev. denied, 388 So.2d 1119 (Fla. 1980), wherein this court first articulated the so-called three-pronged test to establish the "exposure" theory of accident. In that case, the claimant suffered from injury due to true repeated physical trauma for which compensation was denied on the basis that the claimant had not suffered an accident within the meaning of the Act. In reversing, this court recognized that Florida has a long and well-established history of awarding compensation benefits to workers who are injured by exposure to deleterious substances, citing to Orr and Meehan. However, we also noted that benefits almost routinely had been denied to workers whose injuries resulted from repeated minor traumas until the decision in Keller Building Products of St. Petersburg v. Shirley, IRC Order 2-3263, cert. denied, 362 So.2d 1054 (Fla. 1978), wherein the Industrial Relations Commission resolved "this disparate treatment by classifying repeated trauma as a facet of exposure, thereby bringing repeated trauma cases within the ambit of the exposure rationale." Festa, 382 So.2d at 123. "In order to bring together and clarify the exposure rationale," id., this court reviewed the principles established in Orr and subsequent "exposure" cases to arrive at the now oftquoted test that in order for a claimant to recover under the exposure theory of accident,
... he must show 1) prolonged exposure, 2) the cumulative effect of which is injury or aggravation of a pre-existing condition and 3) that he has been subjected to a hazard greater than that to which the general public is exposed. Alternatively, he must demonstrate a series of occurrences, the cumulative effect of which is injury... . [Citation omitted] These same theories should be applied in cases involving injuries resulting from repeated trauma.
Id. at 124.
Thus, the element of prolongation as a unique factor to be established in order to recover seems to have received our indelible imprimatur. However, as can be seen from the discussion of the "exposure" cases in Festa, the emphasis was placed not so much on definitively quantifying the term "prolonged," but rather, on attempting to develop a working definition of the repetitive exposure cases to allow for recovery  an effort which, though well-intentioned, was perhaps unnecessary as suggested by Mr. Alpert.
Thus, we agree wholeheartedly with the judge in the instant case that the factor of "prolonged exposure" may be satisfied in any given case by a showing of any exposure  either a single dose exposure or a *982 repeated exposure. Consequently, we disagree with the employer that the exposure theory of recovery was improperly applied in the instant case.
Florida Power's next point is that even if the exposure theory was applicable in the instant case, the claimant failed to prove the necessary elements. We find that the judge's findings on each of the three elements of the test were based on competent and substantial evidence and affirm.
Florida Power's third point, which is closely related to its second point, is that the judge erred in finding that claimant's disease was compensable because the causal connection between the disease and the employment was based on conjecture and speculation. Specifically, Florida Power points out that no evidence was introduced indicating whether or not the pigeon feces at the Crystal River plant contained the cryptococcal fungus. It also argues that despite the fact that four distinct serotypes of cryptococcosis are found in nature, it was not determined which serotype was present in the claimant. The employer maintains that it was the burden of claimant to establish causation between his employment and his disease by "clear evidence rather than speculation or conjecture." Harris v. Josephs of Greater Miami, Inc., 122 So.2d 561, 562 (Fla. 1960).
However, most recently in Wiley v. Southeast Erectors, Inc., 573 So.2d 946 (Fla. 1st DCA 1991), this court held that although when the injury at issue involves disease or physical defect evidence of causation must be shown by something more than that it is merely logical that the injury arose out of the claimant's employment, "[t]his is not to say that causal relationship requires absolute proof to the exclusion of reasonable inferences." Id. at 948. In that case, the claimant was diagnosed as suffering from an intermediate case of acute silicosis. The claimant's condition was specifically distinguished from ordinary or chronic silicosis which develops over a 10 to 30-year period, in that claimant possessed an idiosyncratic response to inhalation of small particle silica. The evidence established that claimant's duties while employed with the employer as a welder involved working with a product known as Blaze-Shield. We noted that there was no dispute in the record that Blaze-Shield contains the silica which would cause silicosis, but rather, that the dispute concerned "whether manipulation of Blaze-Shield would result in respirable particles." Id. Although claimant's expert witness testified that the product could be reduced into respirable particles in the lab, he further stated that any determination of respirable silica actually discharged into the air at the job site would require testing of air samples taken at the job site while the work was in progress.
In denying compensation, the judge of compensation claims found that because the expert did not test the Blaze-Shield material by the application of heat or other manipulation at the work site, his testimony was insufficient to show that the claimant respired free silica or any other material that caused her present pulmonary condition. Nonetheless, in reversing, we held that although the expert's testimony did not establish with certainty that the claimant's manipulation of Blaze-Shield resulted in air borne particles of five microns or less, his testimony was sufficient to support a reasonable inference that such was the case, citing to the standard of proof contemplated in Meehan v. Crowder and Lake v. Irwin Yacht & Marine Corp., 398 So.2d 902 (Fla. 1st DCA 1981). We specifically noted that in Meehan v. Crowder, the supreme court rejected the employer/carrier's contention that causation in that case was based on conjecture, noting that "[c]onjecture may be said to be supposition without a premise of fact." 28 So.2d at 437. Rather, in Meehan, the supreme court found that the compensation award rested upon an inference of liability which was sustained by the premise of facts to be found, i.e., that the claimant was well immediately preceding the three days to which he was exposed to a mercury solution, and was sick soon after. The court concluded that "[t]he evidence show[ed] a natural sequence of events based on facts from which liability can be inferred." Id.
*983 Similarly, in Lake v. Irwin Yacht & Marine, the claimant's condition of bronchitis was found to be compensable even though the medical test did not establish the cause of the bronchitis. Rather, causal connection between the disease and the employment was found to be shown by the medical testimony to the effect that the claimant's chemical exposure was the most likely cause of her bronchitis based on the claimant's history and the fact that she completely recovered after permanently leaving the employ of Irwin Yacht.
Drawing from the conclusions in those two cases, this court in Wiley held that the reasonable inference of liability therein was supported by the premise of facts to be found, i.e., that the claimant was free of pulmonary difficulties prior to her exposure to Blaze-Shield, and was ill less than a month after said exposure. Additionally, her condition improved when she worked for other employers and worsened when she returned to the Blaze-Shield work environment. Thus, the claimant was exposed to a product which was capable of producing the type of illness which she subsequently developed and the record indicated the existence of "a natural sequence of events based on facts from which liability can be inferred." We agreed with the claimant that the judge's ruling that she was required to prove the actual existence of respirable free silica in the work site imposed a higher standard of proof than required by applicable case law.
The circumstances in the instant case are similar. Here, claimant was exposed to a substance which was the only source identified by expert testimony from which the organism causing claimant's illness has been consistently cultured. The medical testimony clearly established the natural sequence of events from claimant's exposure to the pigeon droppings to his ultimate diagnosis of cryptococcal meningitis. That claimant's work environment created a hazard to which the general public was not exposed was established by the evidence presented at the hearing and reaffirmed by the judge's personal observations of the unique structure of the fossil fuel plants. In this regard, the judge observed the following:
While the construction of the plants differ in some ways, I found that all four of them are basically open plants. They are multi-floor plants, the upper stories being basically open in the center and having a steel skeletal structure. The upper floors, in the areas away from the intense heat of the boilers, all have, to one degree or another, pigeon infestation, and evidence of pigeon feces along the catwalks and on some of the structural members. There are strong air currents in the buildings, obviously created by not only the wind from the outside blowing in, in a "chimney effect," but also because of the rising heat from the heat of the boilers. I did not find there to be great quantities of this feces, but it is there in obvious quantities, and in concentrations much more prevalent than most people are exposed to, and more prevalent than in any environment shown by evidence to have been an exposure of the Claimant elsewise. One might also conclude that the reason there is no more evidence of this is that the feces is obviously dried out, to at least some extent, by the heat of the boilers and the air currents, and the dried feces is disseminated around the air and the plant by these currents. While the evidence I saw would not allow any quantitative measure of such dissemination, it was readily apparent that this feces would be disseminated by the circulations of the air currents and that those in the plant would be exposed to this agent in a much more concentrated manner than the public in general would normally be exposed to. . .. [T]he exposure necessarily encountered in the plant atmosphere is more highly concentrated than in most other places this Claimant has been shown to have frequented. Based on percentage of concentration, or probability of exposure, it could not be reasonably argued but that this Claimant probably received more exposure to pigeon feces in the times he was in the plant than at any other environment he was exposed to.

*984 [Emphasis added.] Based on the foregoing, we agree with claimant that the judge did not err in applying the exposure theory of accident to the instant case and in awarding benefits.
However, we also agree with claimant, as argued on cross-appeal that the judge erred by failing to award interest on past due medical bills unpaid by the employer. See Zafrilla v. Volare Shoes, Inc., 394 So.2d 146 (Fla. 1st DCA 1981); La Croix Construction Co. v. Bush, 471 So.2d 134 (Fla. 1st DCA 1985). See also Winn-Dixie Stores v. Morgan, 533 So.2d 783 (Fla. 1st DCA 1988). Accordingly the order is AFFIRMED, in part, but REVERSED, in part, and REMANDED, to allow for an award of the claimed interest.
SMITH, J., and WENTWORTH, Senior Judge, concur.